# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>vs.<br><br>FLAVIO GOMEZ-PALACIOS,<br><br>               Defendant. | MEMORANDUM DECISION<br>AND ORDER DENYING<br>MOTION TO SUPPRESS<br><br>Case No. 2:08CR567DAK |

      This matter is before the court on Defendant Flavio Gomez-Palacios's Motion to Suppress Evidence. The court held an evidentiary hearing on the motion on December 2, 2008, and closing arguments on January 7, 2009. At the hearings, Defendant was present and represented by Scott Williams. Plaintiff was represented by Adam Elggren. The court has carefully considered all pleadings, memoranda, and other materials submitted by the parties as well as the law and facts relating to the motion. Now being fully advised, the court renders the following Order.

## FINDINGS OF FACT

      In the early morning hours of June 8, 2008, Officer Jeremy Sayes and Officer Tiffany Commagere were on duty as patrol officers for the Salt Lake Cit Police Department. The officers were in separate patrol cars and Officer Commagere was accompanied by a recruit, Officer Carling. While driving by a residence at 1460 South 900 West, Salt Lake City, the officers

observed a large party.  Officer Sayes estimated about one hundred people were at the house, both inside and outside the house.  The officers also heard loud music coming from the house. Officer Sayes remarked to Officer Commagere over their communications system that he thought the officers were likely to get a noise complaint about the party.

At about 1:50 a.m., both officers received a dispatch call directing them to the same residence.  The exact wording of the dispatch call is unclear.  Officer Sayes described it as "a call of shots fired and a possible fight."  He then responded affirmatively when asked if it was a call of "a reported fight with a possibility of shots fired."  Officer Commagere described the dispatch call as a call "about shots fired."  Her report characterized the call as "a fight/party call," "followed by, 'there was mention that shots had been fired" by dispatch.  Officer Sayes testified that "that's normally how they come in" from dispatch: "possible shots fired."

Both officers responded to the call within minutes and parked their vehicles some distance to the north of the house.  All three officers approached the house together.  As they neared the house, the officers saw numerous people running from the house in all directions. Some of the people were running away on foot and others were getting into cars and driving away.  As the officers got closer to the house, they noticed people were also running toward the back of the house and some were changing direction after observing the police officers.

Officer Sayes testified that he was concerned about the safety of himself and his fellow officers, as well as that of the public, given the "possible shots fired" call from dispatch.  Officer Says said that he was particularly concerned about people carrying weapons and was focused on looking at people's hands as he approached the house.  He testified that he was specifically

looking at locations where people could be carrying weapons on their persons, such as pockets and waistbands.

When the officers were about fifteen feet from the house, coming from the north, Officer Sayes observed three or four people exit the house from a door on the north side that opened onto the driveway. One of the three or four people was Defendant. Defendant initially drew the attention of Officer Sayes because he was moving slowly, acting nonchalant, and avoiding eye contact, while other people at the scene were running away. Defendant also drew Officer's Sayes' attention because of the way he held his right hand to the side of his body, while his left had swung freely.

Officer Sayes testified that, from his training and experience, people carrying weapons will subconsciously keep their arm by their weapon or subconsciously touch it, which Officer Sayes suspected of Defendant. Officer Sayes testified that Defendant's behavior of keeping one arm from moving was consistent with someone who is carrying a weapon, based upon his training and experience. Officer Sayes also testified that he has been trained to try to keep as many people at the scene of a possible crime.

Defendant initially ignored calls from Officer Carling and Officer Sayes to stop. Defendant was walking along the house to the east and then turning the corner. Officer Sayes could not get Defendant to stop so he grabbed Defendant's left arm and told him to stay. Defendant said "OK." Officer Sayes directed Defendant back toward the staircase leading to the door where Defendant had come from. Defendant slowly turned away from Officer Sayes, facing the house, then slowly turned in the direction to go toward the door. As he did so, Sayes noticed

what he immediately recognized as the handle of a pistol sticking out of the right pocket of Defendant's shorts.

After seeing the handle of the firearm, Sayes took hold of Defendant's arms, behind Defendant's back, and pushed him against the wall of the house. Officer Commagere testified that she also observed the firearm at about the same time and she heard Sayes say, "gun." While Sayes kept hold of Defendant's arms, Commagere removed a pistol from the right front pocket of Defendant's shorts. Defendant was wearing a white t-shirt and baggy plaid shorts. Commagere cleared the weapon and observed three spent rounds and three unspent rounds were in the chambers.

Defendant testified to a different version of the events that is at odds with the testimony of the officers. Defendant testified that after Sayes grabbed his arm, the other officer began to search him. Defendant testified that Sayes felt his right front pocket and pulled out the gun. Defendant testified that he did not believe that the firearm in his pants pocket could have been visible because of the way he was wearing his clothes.

Defendant demonstrated how he was wearing his clothes at the time of the incident. He put his t-shirt on to show how far it hung down. He wore his t-shirt untucked and it hung about ten inches below his hip bone. Defendant testified that although a lot of people wear their shorts low on their hips, he wore his at his waist. Even if this was the case, there would still be many different ways for the gun to be showing. Defendant testified that he drank about 48 ounces of beer while he was at the party, but that it did not affect his recollection of the events.

## CONCLUSIONS OF LAW

Defendant claims that the evidence in this case should be suppressed because he was illegally detained and frisked. The Fourth Amendment applies to seizures of a person, including seizures that involve only a brief detention. *Brown v. Texas*, 443 U.S. 47, 50 (1979). The United States Supreme Court has recognized three general types of encounters between citizens and the police: (1) consensual encounters; (2) investigative detentions; and (3) arrests. *See United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996). Any investigative detention requires that the stop be supported by reasonable and articulable suspicion of criminal activity. *See United States v. Cortez*, 449 U.S. 411, 417-18 (1981); *see also Terry v. Ohio*, 392 U.S. 1 (1968).

The reasonableness of a *Terry* stop is evaluated objectively and such evaluations must consider the totality of the circumstances and information available to the officers. *United States v. Lang*, 81 F.3d 955, 965 (10th Cir. 1996). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

Therefore, the court's analysis must begin with the information known to Officer Sayes when he approached Defendant. Sayes had received a call from dispatch that there were possible shots fired at the party. He was looking for individuals with a gun or who may be connected with the incident. Unlike the other partygoers, Defendant was walking slowly and kept one arm to the side while swinging the other arm naturally. Based on Sayes' training and experience, this behavior indicated that Defendant may be carrying a firearm. Accordingly, Sayes approached

5

Defendant and attempted to make him stop.  Sayes' did not grab and hold Defendant as characterized by Defendant's counsel.  The testimony established that Sayes physically stopped Defendant, told him to go back to the staircase, and Defendant turned on his own.

Given the factual circumstances, Sayes' brief encounter designed to allow him to question Defendant about the shots and the possibility that Defendant was carrying a firearm was reasonable.  The scene was chaotic and there was an actual report of criminal activity.  The officers would have been justified in asking any of the individuals exiting the house what information they had regarding whether shots were fired.  *Terry*, 392 U.S. at 22 (recognizing "that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest"). In this instance, the officers focused on an individual who not only had been at the scene of the criminal activity, but who also demonstrated physical characteristics suggesting that he was carrying a firearm.  Sayes was justified in relying on his training regarding the physical mannerisms of individuals carrying firearms.

Officer Sayes was also justified in noticing individuals who, unlike all of the others at the scene, were not running.  Defendant argues that the officers would claim that running was also suspicious.  However, in this instance, there were reports of shots.  People were fleeing not only from police but from a party where shots had been fired.  An individual who was not running from such events would naturally draw one's attention and should raise an officer's suspicion as to why they were not running like everyone else.  Defendant's nonchalant behavior conveys that he was not fearful as a result of the shots that had been fired.  When that individual is also

walking in a manner that suggests he has a gun it suggest that he is not running because he likely has a gun to protect himself or was, in fact, the person who fired the shots.  Officers are trained to recognize these types of behavior as suspicious.  As in *Terry*, it would have been poor police work if Sayes had not investigated this behavior further.  *See* 392 U.S. at 23.

Given the facts, the court finds no reason for second guessing the officer's suspicions and initial detention of Defendant.  Moreover, "[q]uantitatively, reasonable suspicion means something less than probable cause and 'falls considerably short of satisfying a preponderance of evidence standard.'" *United States v. Portillo-Portillo*, 267 Fed. Appx. 760, 764 (10th Cir. 2008).  Reasonable suspicion requires only "some minimal level of objective justification." *Id.*  The court concludes that there was an adequate objective justification for Sayes to detain Defendant in the manner he did in order to investigate the criminal activity reported by dispatch.  *See Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("Even in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation . . . . *Terry* recognized that the officers could detain the individuals to resolve the ambiguity.").

Defendant claims that his case is similar to Tenth Circuit cases that found the investigative detention was inappropriate.  *See United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996); *United States v. Gorman*, 66 Fed. Appx. 801, 3002 WL 2118623` (10th Cir. 2003). The court, however, finds those cases factually distinguishable from the present case.  None of those cases involved a situation where the police where called to the location because of a report of criminal activity.  The cases relied on by Defendant involved police patrolling in a high crime area and detaining people on the street that they thought were suspicious and a detention based

on suspicions of a firearm when the traffic stop was unrelated to firearms. The present case involved a call from dispatch regarding potential shots fired and an individual who was physically acting as though he was carrying a firearm at the precise location that the activity was reported to have occurred. Unlike the cases relied on by Defendant, the detention in this case was based on suspicious behavior specifically tied to the reported criminal behavior.

After Defendant turned toward the staircase, Sayes immediately witnessed the firearm protruding from Defendant's pocket. Once Sayes saw the firearm, Sayes had probable cause that Defendant may have committed the crime Sayes' was investigating. "An arrest is a seizure for Fourth Amendment purposes, and is reasonable where there is probable cause to believe that an offense has been or is being committed." *United States v. Davis*, 197 F.3d 1048, 1051 (10th Cir. 1999). Both officers testified to being able to see the firearm in Defendant's pant pocket. The officers also consistently testified that Sayes' detained Defendant while Commagere removed the firearm from Defendant's pocket. The court finds the officers' testimony more credible than Defendant's version of the facts. Defendant claims that Officer Commagere's testimony supports his version of the facts. The court, however, finds Commagere's testimony consistent with Sayes' testimony. Commagere did not testify that Sayes' interaction with Defendant was one continuous movement. The credible facts indicate that Sayes first say the weapon, moved to detain Defendant. Commagere noticed Sayes' detaining Defendant, saw the gun, and removed the gun while Sayes held Defendant. Therefore, there is no basis for determining whether a inappropriate "frisk" occurred.

## CONCLUSION

Based on the above reasoning, Defendant's Motion to Suppress Evidence is DENIED.

DATED this 28th day of January, 2009.

                BY THE COURT:

                _____
                DALE A. KIMBALL
                United States District Judge